# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 7, 2021

Lyle W. Cayce
Clerk

No. 20-60089

Alexander Gutierrez Acosta,

*Petitioner*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A215 587 014

Before Dennis and Engelhardt, *Circuit Judges*, and Hicks, *District Judge*.*.

Per Curiam:*

Alexander Gutierrez Acosta, a native and citizen of Cuba, petitions for review of an order issued by the Board of Immigration Appeals ("BIA"). Claiming to seek relief from political persecution, Gutierrez Acosta applied

---

* Chief Judge of the Western District of Louisiana sitting by designation.

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-60089

for asylum and withholding of removal. The Immigration Judge ("IJ") denied his application, the BIA dismissed his appeal of the denial, and he was removed from the United States in March 2020. We now GRANT his petition for review, VACATE the BIA's decision, and REMAND for further proceedings consistent with this opinion.

## I.

## A.

Gutierrez Acosta sought admission to the United States at Hidalgo, Texas, on May 24, 2018. The Department of Homeland Security later served him a Notice to Appear that charged him as removable because he lacked valid entry documents. Gutierrez Acosta filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] His application asserted that he sought relief from political persecution in Cuba. He also submitted letters from friends and family in Cuba describing the harm he had suffered, as well as articles and reports concerning human rights violations in Cuba generally.

Gutierrez Acosta appeared *pro se* before the IJ for a merits hearing in December 2018. At the outset of the hearing, the IJ declined to admit the letters and then continued with the proceeding. Gutierrez Acosta testified that he had worked for the Cuban government for 12 years at an international diving center. His troubles apparently began in June 2017, when four American clients, after concluding a diving session with him, inquired about conditions in Cuba. Responding to their questions, Gutierrez Acosta explained that salaries in Cuba were "low and insufficient" such that, if workers "did not resort to stealing, they would not be able to make ends meet

---

[1] Gutierrez Acosta does not challenge the BIA's determination respecting the IJ's denial of CAT protection. Accordingly, we do not consider that issue.

in Cuba." He also told them that the Cuban police are corrupt, that Cubans are "basically prisoners" because it is very difficult to travel outside the country, that "everything is very complicated for" Cuban citizens, and that the only Cubans who "live well" are "the police officers and those in charge of national security." He also stated that the Castro regime "did more bad things than good."

Whenever Americans were around, according to Gutierrez Acosta's testimony, surveillance increased by the addition of more security officers. One such officer overheard his conversation with the American clients and later pulled him aside to question him. When the officer asked why he was speaking negatively about Cuba, Gutierrez Acosta replied: "that was what [he] thought of" Cuba. The two men argued, and the officer eventually told Gutierrez Acosta that "he was going to pull [him] out of [his] job" and "make sure that [he] would never go back to working with tourists or anywhere within the tourism industry." Inquiring what "these Americans" do when diving with Gutierrez Acosta, the officer insinuated that they might graffiti shipwrecks with expressions "against Fidel [Castro]." The officer further threatened that he would be "watching" Gutierrez Acosta, "doing follow-up, and if he saw [him] talking to any other tourists, he was going to make [his] life impossible."

The very next day, Gutierrez Acosta's boss called and fired him from his job. His boss also asked him to explain what happened with the security officer, but he responded: "[N]o, I'll just leave this job. You know, you can ask the officer to explain that to you." Although he insisted that it was not the reason for his termination, Gutierrez Acosta admitted on cross-examination that he had in fact been stealing money from his employer (the government) "for quite some time."

Gutierrez Acosta again encountered the police in February 2018. Diving with long-time friends from Argentina, he was detained by the coast guard police who suspected him of giving unauthorized private diving lessons. It would have been illegal for Gutierrez Acosta to accept any payment, but his friends were not paying him. Believing that Gutierrez Acosta was lying about not accepting payment, the officers took him to the police station, detained him for one hour, seized his scuba equipment, and fined him 1,500 pesos. When asked whether the police arrested him under the belief that he was breaking the law, Gutierrez Acosta responded affirmatively. But he also testified that the officers refused to ask the friends whether they were paying him. And he stated that when he arrived at the station, an officer, who he identified as Captain Alexander, mocked him, saying "well look who just came in, that person that likes to speak well about our country."

Not long after, four officers, including Captain Alexander, came to Gutierrez Acosta's home and, claiming information that he was operating an unauthorized diving center, conducted a search. Gutierrez Acosta asked if they had a search warrant, but one of the officers said "I don't need a search warrant to come in here, because I have information that you've been speaking badly about Cuba, which is your country . . . . and that's called being a traitor against the government." When the officers found nothing, Gutierrez Acosta began to laugh, and an officer said, "you're lucky we didn't find the diving center that we were looking for here." Gutierrez Acosta then began to argue with the officers, calling them corrupt and telling them that they were abusing their authority. At that point, the officers pushed him to the ground, handcuffed him, and took him to the police station, where they detained him for an hour after striking his face a few times and fining him 1,500 pesos as "a formal warning for not respecting the authorities."

No. 20-60089

In April 2018, Gutierrez Acosta attended a celebration of Cuban independence when he was again approached by the same police officers. One of the officers, apparently Captain Alexander, said that he thought Gutierrez Acosta "might be talking bad about us or bad about Cuba because you're known to do that[,] . . . . that's what you dedicate your time to, [telling] the population bad things about us here." Gutierrez Acosta asked the officers to leave him alone because they were making his "life impossible." He then called the officers "very corrupt" and attempted to flee, but "a cloud of police officers" handcuffed and arrested him. They detained him for three days, during which time they called him various slurs and beat him, injuring his arm and dislocating his shoulder. Charged with "disorderly conduct" and "not taking orders from a police officer," they issued a fine of 3,000 pesos and a formal warning. Soon thereafter, Gutierrez Acosta fled Cuba, ultimately reaching the United States.

## B.

The IJ issued a decision denying Gutierrez Acosta's application for relief. But on an initial appeal, the BIA remanded the case, determining that the IJ should have considered the letters Gutierrez Acosta submitted. Taking account of the letters on remand, the IJ again denied relief.

At the outset of his opinion, the IJ found Gutierrez Acosta's testimony not credible because of "inconsistencies" and "lack of candor." More significantly, after again finding that the harm suffered did not amount to past persecution, the IJ concluded that "the most detrimental issue regarding [Acosta Gutierrez's] claim is that the harm and persecution he alleges appears to be based on lawful prosecution as opposed to persecution." First, the IJ noted that Gutierrez Acosta's admission that he had been stealing money was "a reasonable basis for termination" from his job. Second, he emphasized that the search of Gutierrez Acosta's home was founded on the belief that he was "operating an illegal enterprise, which serves as a

No. 20-60089

reasonable basis for a search." Third, the IJ observed that the arrest following the home search was due to a "verbal altercation with the officer searching his home" which led to charges of "disorderly conduct." And finally, the IJ concluded that Gutierrez Acosta's independence-day encounter with the police resulted in arrest only "after he attempted to flee and failed to comply with police officer's orders." In sum, the IJ found that Gutierrez Acosta's "detentions and searches from police were either in response to an investigation into unlawful activity or a response to unlawful activity." Therefore, Gutierrez Acosta failed to establish that "his political opinion was a central reason for his harm."

On appeal for the second time, the BIA expressly declined to consider the IJ's credibility determination. Instead, it evaluated the IJ's findings respecting the motivations that animated the firing and police encounters, finding no clear error in the IJ's conclusion that each situation stemmed from a legitimate cause unrelated to political persecution. And the BIA, citing no alternative grounds for its decision, considered those findings dispositive. It concluded that Gutierrez Acosta could not show "past persecution or a well-founded fear of persecution" because he had failed to establish that a protected ground "was or would be at least one central reason for the harm experienced and feared." Accordingly, the BIA dismissed the appeal, and Gutierrez Acosta timely filed this petition for review.

## II.
## A.

We generally review only final decisions of the BIA. *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007). But when the BIA's decision is affected by the IJ's ruling, we also review the IJ's decision. *Id.* While we review questions of law *de novo*, we review factual findings for substantial evidence

6

No. 20-60089

and will reverse only if the record compels a different finding. *Sharma v. Holder*, 729 F.3d 407, 411 (5th Cir. 2013).

## B.

The Attorney General has discretion under 8 U.S.C. § 1158(b)(1) to grant asylum to refugees who meet certain requirements. To qualify for asylum, an applicant "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). To demonstrate the required nexus between a protected category and the persecution, an applicant must show that he was persecuted or has a reasonable fear of future persecution because of it. *Sharma*, 729 F.3d at 412. He "is not required to provide direct proof of his persecutor's motives, but [he must] provide *some* evidence of it, direct or circumstantial." *Id.* (internal quotation marks and citation omitted).

"[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Sharma*, 729 F.3d at 411 (alteration in original) (quoting *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009)). We have, however, recognized that some actionable cases do involve mixed motives, "where persecutors may have legitimate reasons for their actions, but an additional central reason for their actions is persecution on account of a protected category." *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016). Determining a persecutor's actual motive and whether a persecutor was "solely motivated by a legitimate" reason are findings of fact that we review for substantial evidence. *Id.* at 384. But we may still "reverse a decision that was decided on the basis of an erroneous application of the law." *Mikhael v. I.N.S.*, 115 F.3d 299, 305 (5th Cir. 1997).

### C.

Gutierrez Acosta contends that the BIA erred in two respects.  First, he challenges the BIA's decision to give dispositive effect to the IJ's finding that legitimate, non-political reasons could have motivated the harms he suffered.  Even assuming the record supported that finding, he maintains that the mere existence of potential legitimate reasons does not in itself foreclose the possibility that the abuses were also politically motivated.  "Other evidence in the record," Gutierrez Acosta notes, "could still establish that [his] political opinions were 'one central reason' for the persecutory action."  But the BIA "ignored all the record evidence that supports a finding that the police were motivated by [his] political opinions."  Second, he contends that, having declined to review the IJ's adverse credibility determination, the BIA erred in disregarding all of his testimony that suggested he was in fact persecuted on account of his political opinion.  His arguments are persuasive.

We have found grounds for remand where the BIA failed to evaluate all the evidence about potential mixed motives, some legitimate and some illegitimate.  In *Sharma*, the BIA had determined that the petitioner's mistreatment was motivated by legitimate reasons, and on appeal we readily observed the reasonableness of that conclusion.  729 F.3d at 412–13.  But that was not the end of the matter.  Noting that the BIA had failed to consider all of the evidence in the record relating to whether the petitioner's political opinion may *also* have been a motivation, we held that the BIA's finding was not supported by substantial evidence.  *Id.* at 412.

Here, the BIA determined that Gutierrez Acosta's maltreatment was motivated by legitimate reasons, and, as in *Sharma*, that conclusion may have been entirely reasonable.  But it does not appear that the BIA considered any of the evidence in the record relating to whether the Cuban government actors involved were also motivated, at least in part, by Gutierrez Acosta's

political opinion.  Indeed, the BIA focused *solely* on whether legitimate reasons could justify the actions, expressly declining to even consider the IJ's determination that Gutierrez Acosta's testimony was not credible.

Yet there is ample evidence in the record supporting the possibility that an illegitimate motivation was present here.  For example, Gutierrez Acosta was fired from his job the very day after a security officer confronted him for speaking negatively about Cuba.  The officer's direct statements to Gutierrez Acosta and the proximity between those statements and his firing plainly suggest that he was not fired for apolitical, legitimate reasons alone— especially when the record is not clear whether the police or his employer even knew about the embezzlement to which the IJ and BIA attributed the termination.[2]  Likewise, Captain Alexander's sarcastic mocking about Gutierrez Acosta's political statements when he was detained after diving with his friends suggests a motivation different from merely diving without a license.  Additionally, when the officers searched Gutierrez Acosta's residence, they directly referenced his political speech as justification for searching his home without a warrant.  In short, the record contains evidence indicating that Gutierrez Acosta's political opinion may have been one central reason for the harms he suffered.  The difficulty with the BIA's opinion is that it seems not to have so much as considered that possibility.[3]

---

[2] While Gutierrez Acosta's account of his conversation with the Americans notes that he mentioned how low wages prevalent in Cuba cause many workers to resort to stealing, he seems to have spoken about conditions generally and nothing suggests that he confessed, in that or any other conversation, to personally stealing.  That could account for the reason he did not acknowledge the fact until questioned about it on cross-examination.  Significantly, however, the security officer's comments in the confrontation that preceded the firing—at least by Gutierrez Acosta's telling, and there is no other recounting—made no mention of the stealing.  Nor was any reason at all mentioned in the phone call with his supervisor, neither embezzlement nor political opinion.

[3] Even the government's brief on appeal concedes that "[i]f the applicant can establish that a threshold basic (protected) motive exists, but there are also other motives

No. 20-60089

As *Sharma* teaches, such contrary evidence may not be simply ignored. *Id.* at 412.

This case is both factually and substantively distinguishable from the Supreme Court's recent decision in *Garland v. Dai*, No. 19–1155, 2021 WL 2194837 (U.S. June 1, 2021). In the two consolidated cases on appeal there, neither the IJ nor the BIA made an express credibility determination and so the Ninth Circuit applied a presumption of credibility. *Id.* at \*5. The Supreme Court rejected that approach, holding instead that only the BIA is permitted to apply such a presumption when the IJ does not make an express credibility determination. *Id.* at \*9. "[T]he court of appeals," it concluded, "must accept the agency's findings of fact as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotations omitted). But this case is factually unlike *Dai* because the IJ expressly made an adverse credibility finding yet the BIA expressly declined to review it. Significantly, we do not purport to make any determinations about credibility. Had the BIA said nothing about credibility, we might be compelled to conclude that it implicitly agreed with the IJ's conclusion. *See id.* at \*7 (noting that the BIA's silence could fairly have been understood as a rejection of credibility). But the BIA was not silent here; it expressly declined to reach the issue of credibility. Nevertheless, it proceeded to consider *only* facts that tended to favor the IJ's findings on the

---

unrelated to the protected grounds (non-protected), the agency must then conduct a mixed-motive analysis to determine whether the applicant has demonstrated that a protected ground was or will be at least one central reason for persecuting the applicant." Nevertheless, the government devotes the remainder of its brief to discussing the BIA and IJ's findings of fact concerning possibly legitimate reasons that Gutierrez Acosta was targeted and why those findings are supported by substantial evidence. And it nowhere addresses the BIA's failure to confront any of the contrary evidence.

No. 20-60089

merits. That was error. *Id.* at *5 ("[T]he BIA may [not] arbitrarily reject an alien's evidence.").

Furthermore, the BIA nowhere considered whether the legitimate justifications offered for the various police encounters could have been pretext for persecution. We have noted a distinction recognized by the BIA "between legitimate investigation and what is instead pretext for persecution." *Sealed Petitioner*, 829 F.3d at 384. And we have identified several factors, first expounded by the BIA, for courts to consider when determining the motive of a persecutor. *Id.* at 385 (citing *In Re S–P–*, 21 I. & N. Dec. 486, 492 (BIA 1996)).

This record contains evidence at least suggesting the presence of pretextual justifications. For instance, when the officers searched Gutierrez Acosta's residence, they purported to seek evidence that he was operating an unauthorized diving center. But one of the officers involved, Captain Alexander, had on a prior occasion expressed open disdain for Gutierrez Acosta's political opinions, taunting him as "that person that likes to speak well about our country." And when executing the search, one of the officers, possibly Captain Alexander, alluded to "information that you've been speaking badly about Cuba . . . . and that's called being a traitor against the government." All this is consistent with Gutierrez Acosta's corroborating evidence—disregarded by the BIA—that the Cuban government commonly employs arbitrary arrests, house searches, confiscation of instruments of work, laws against public disorder, and other harassment techniques for the purpose of punishing political dissent. Yet, the BIA considered none of this, and thus failed "to examine the record 'in light of the agency's own established standards for mixed motive claims.'" *Id.* at 387 (quoting *Vumi v. Gonzales*, 502 F.3d 150, 159 (2d Cir. 2007)).

### III.

The BIA failed to consider any of the evidence suggesting that Gutierrez Acosta's political opinions were one central reason for his mistreatment. Nor did the BIA contemplate the possibility or address the indications that purported justifications for actions taken against Gutierrez Acosta may have been pretextual. For these reasons, we GRANT the petition for review, VACATE the BIA's decision, and REMAND for the BIA to conduct further proceedings consistent with this opinion.